We will continue argument this morning in Case No. 11-393, National Federation of Independent Business v. Sebelius, and Case No. 11-400, Florida v. the Department of HHS. Mr. Clement? Mr. Chief Justice, and may it please the Court, if the individual mandate is unconstitutional, then the rest of the Act cannot stand. As Congress found and the federal government concedes, the Community Rating and Guaranteed Issue provisions of the Act cannot stand without the individual mandate. Congress found that the individual mandate was essential to their operation. And not only can Guaranteed Issue and Community Rating not stand, not operate in the manner that Congress intended, they would actually counteract Congress's basic goal of providing patient protection, but also affordable care. If you do not have the individual mandate to force people into the market, then Community Rating and Guaranteed Issue will cause the cost of premiums to skyrocket. We can debate the order of magnitude of that, but we can't debate that the direction will be upward. We also can't debate— That may well be true. The economists are going back and forth on that issue, and the habit of doing the legislative findings. What we do know is that for those states that found prices increasing, that they found various solutions to that. In one instance, we might or may not say that it's unconstitutional, Massachusetts passed the mandatory coverage provision, but others adjusted some of the other provisions. Why shouldn't we let Congress do that if, in fact, the economists prove—some of the economists prove right that prices will spiral? What's wrong with leaving it to in the hands of the people who should be fixing this, not us? Well, a couple of questions—a couple of responses, Justice Sotomayor. First of all, I think that it's very relevant here that Congress had before it, as examples, some of the states that had tried to impose Guaranteed Issue and Community Rating and did not impose an individual mandate, and Congress rejected that model. So your question is quite right in the saying that it's not impossible to have Guaranteed Issue and Community Rating without an individual mandate, but it's a model that Congress looked at and specifically rejected. And then, of course, there's Congress's own finding, and their finding, of course, this is finding I, which is 43A of the government's brief in the appendix. Congress specifically found that having the individual mandate is essential to the operation of Guaranteed Issue and Community Rating. That's all it said it was essential to. I mean, I'm looking at it. The exchanges, the state exchanges, are information-gathering facilities that tell insurers what the various policies actually mean. And that has proven to be a cost-saver in many of the states who have tried it. So why should we be striking down a cost-saver when if what your argument is was that Congress was concerned about costs rising? Why should we assume they wouldn't have passed an information? I think a couple of things. One, I mean, I would think you'd sort of have to take the bitter with the sweet. And if Congress, if we're going to look at Congress's goal of providing patient protection but also affordable care, we can't, I don't think it works to just take the things that save money and cut out the things that are going to make premiums more expensive. But at a minimum... I think kind of bottom line is why don't we let Congress fix it? Well, let me answer the bottom line question, which is no matter what you do in this case, at some point there's going to be, if you strike down the mandate, there's going to be something for Congress to do. The question is really what task do you want to give Congress? Do you want to give Congress the task of fixing the statute after something has been taken out, especially a provision at the heart? Or do you want to give Congress the task of fixing health care? And I think it would be better in this situation... If we strike down one provision, we're not taking that power away from Congress. Congress could look at it without the mandatory coverage provision and say, this model doesn't work, let's start from the beginning. Or it could choose to fix what it has. We're not... Declaring one portion doesn't force Congress into any path. And of course that's right, Justice Sotomayor. And no matter what you do here, Congress will the options available. So if you strike down only the individual mandate, Congress could say the next day, well, that's the last thing we ever wanted to do. So we're going to strike down the rest of the statute immediately and then try to fix the problem. So whatever you do, Congress is going to have options. The question is... There's such a thing as legislative inertia, isn't there? Well, that's exactly what I was going to say, Justice Scalia, which is, I think the question for this Court is we all recognize there's legislative inertia. And then the question is, what's the best result in light of that reality? Suggesting that we should take on more power to the Court. No, I... Congress would choose to take one path rather than another. That's sort of taking on to the Court more power than one, I think, would want. And I agree. We're simply asking this Court to take on, straight on, the idea of the basic remedial inquiry into severability, which looks to the intent of the Congress... You about that. Why do we look to the... You surely look to the intent of the Congress. I thought that, you know, sometimes Congress says that these provisions will... all the provisions of this Act will be severable. And we ignore that when the Act really won't work, when the remaining provisions just won't work. Now, how can you square that reality with the proposition that what we're looking for here is what would this Congress have wanted? Well, two responses, Justice Scalia. Well, you can look at this Court's cases on severability, and they all formulate the test a little bit differently. Yeah, they sure do. Every one of them talks about congressional intent. But here's the other answer. That's true, but is it right? It is right. And here's how I would answer your question, which is, when Congress includes a severability clause, it's addressing the issue in the abstract. It doesn't say, wait, no matter which provisions you strike down, we absolutely positively want what's left. All right. The consequence of your proposition, would Congress have enacted it without this provision? Okay, that's the consequence. That would mean that if we struck down nothing in this legislation but the, what's it called, the cornhusker kickback, okay, we find that to violate the constitutional proscription of venality, okay. When we strike that down, it's clear that Congress would not have passed it without that. It was the means of getting the last necessary vote in the Senate. And you're telling us that the whole statute would fall because the cornhusker kickback is bad. That can't be right. Well, Justice, I think it can be, which is to say the basic proposition, that it's congressional intent that governs. Now, everybody on this Court has a slightly different way of divining legislative intent. And I would suggest the one common ground among every member of this Court, as I understand it, is you start with the text. Everybody can agree with that. So, Mr. Clement, let's start with the text. And you suggest, and I think that this is right, that there is a textual basis for saying that the guarantee issue and the community rating provisions are tied to the mandate. And you pointed to where that was in the findings. Is there a textual basis for anything else? Because I've been unable to find one. It seems to me that if you look at the text, the sharp dividing line is between guarantee issue, community ratings on the one hand, everything else on the other. Well, Justice Kagan, I'd be delighted to take you through my view of the text and why there are other things that have to fall. The first place I'd ask you to look is finding J, which is on the same page, 43A. And as I read that, that's a finding that the individual mandate is essential to the operation of the exchanges. But there are other links between guaranteed issue and community rating and the exchanges. And there, I think, it's just the way that the exchanges are supposed to work. And the text makes this clear, is they're supposed to provide a market where people can compare community-rated insurance. That's what makes the exchanges function. Although the exchanges function perfectly well in Utah, where there is no mandates, they function differently, but they function. And the question is always, does Congress want half a loaf? Is half a loaf better than no loaf? And on something like the exchanges, it seems to me a perfect example where half a loaf is better than no loaf. The exchanges will do something. They won't do everything that Congress envisioned. Well, Justice Kagan, I think there are situations where half a loaf is actually worse. And I want to address that, but before I, more broadly, but before I do that, if I can stick with just the exchanges. I do think the question that this Court is supposed to ask is not just whether they can limp along and they can operate independently, but whether they operate in the manner that Congress intended. And that's where I think the exchanges really fall down. Because the vision of the exchanges was that if you got out of this current situation where health insurance is individualized price based on individualized underwriting, and you provide community rating, then it's going to be very easy for people to see, okay, well, this is a silver policy, and this is a bronze policy, and this is a gold policy. And we can, you know, take which insurer provides what I think is going to be the best service based on those comparable provisions. Mr. Clement, you just said something which you say a lot in your brief. You say the question is the manner in which it would have operated. And I think that that's not consistent with our cases. And I guess the best example would be Booker, where we decided not to sever provisions, notwithstanding that the sentencing guidelines clearly operate in a different manner now than they did when Congress passed them. They operate as advisory rather than mandatory. Well, but Justice Kagan, I mean, I actually think Booker supports our point as well, because there are two aspects of the remedial holding of Booker. And the first part of it, which I think actually very much supports our point, is where the majority rejects the approach of the dissent, which actually would have required nothing in the statute to have been struck, not a single word. But nonetheless, this Court said, boy, if you do that, then all of the sentencing is basically going to be done by a combination of the juries and the prosecutors, and the judges are going to be cut out. And the Court said the one thing we know is that's not the manner in which Congress thought that this should operate. Now, later they make a different judgment about which particular provisions to cut out. But I do think Booker's consistent with this way of looking at it, certainly consistent with Brock, the opinion that we rely on, because there the Court only reached that part of the opinion after they'd already found that the must-hire provision operated functionally independent from the legislative veto. Mr. Clement, there are so many things in this Act that are unquestionably okay. I think you would concede that reauthorizing, what is it, the Indian Health Care Improvement Act, changes to the backlog benefits, why may Congress redo those? I mean, it's a question of whether we say everything you did is no good, now start from scratch, or to say, yeah, there are many things in it that have nothing to do, frankly, with the affordable health care, and there are some that we think it's better to let Congress to decide whether it wants them in or out. So why shouldn't we say it's a choice between a wrecking operation, which is what you are requesting, or a salvage job, and a more conservative approach would be salvage rather than throwing out everything? Well, Justice Ginsburg, two kinds of responses to that. One, I do think there are some provisions that I would identify as being at the periphery of this statute, and I'll admit that the case for severing those is perhaps the strongest. But I do think it's fundamentally different, because if we were in here arguing that some provision on the Affordable Care Act or some of the provisions that you've mentioned was unconstitutional, I think you'd strike it down and you wouldn't even think hard about severability. What makes this different is that the provisions that have constitutional difficulties or are tied at the hip to those provisions that have the constitutional difficulty are the very part of this act. And then if you look at how they are textually interconnected with the exchanges, which are then connected to the tax credits, which are also connected to the employer mandates, which is also connected to some of the revenue offsets, which is also connected to Medicaid, if you follow that through, what you end up with at the end of that process is just sort of a hollow shell. And at that point, I think there is a strong argument for not — I mean, we can't possibly think that Congress would have passed that hollow shell without the hard — Well, but it would have — it would have passed parts of the hollow shell. I mean, a lot of this is reauthorization of appropriations that have been reauthorized for the previous five or 10 years. And it was just more convenient for Congress to throw it in the middle of the 2,700 pages than to do it separately. I mean, can you really suggest — I mean, they cite the Black Lung Benefits Act, and those have nothing to do with any of the things we're talking about. Well, Mr. Chief Justice, you know, they tried to make them germane, but I'm not here to tell you that — you know, some of their — surely there are provisions that are just looking for the next legislative vehicle that's going to make it across the finish line, and somebody's going to attach it to anything that's moving. I mean, I'll admit that. But the question is, when everything else from the center of the Act is interconnected and has to go, if you follow me that far, then the question is, would you keep this hollowed-out shell? But I'm still not sure what is the test, and this was a topic where you hit with Justice Scalia with the Cornhusker hypothesis. I need to know what standard you're asking me to apply. Is it whether, as a rational matter, separate parts could still function? Or does it focus on the intent of the Congress? If you — suppose you had party A wants proposal number one. Party B wants proposal number two, completely unrelated. One is airline rates. The other is milk regulation. And they decide them together. The procedural rules of these have to be voted on as one. They're both passed. Then one's declared unconstitutional. The other can operate completely independently. Now, we know the Congress would not have intended to pass one without the other. Is that the end of it? Or is there some different test? Because we don't want to go into legislative history. That's intrusive. So we ask whether or not an objective — as an objective, rational matter, one could function with that. I still don't know what the test is that we're supposed to apply. And this is the same question as Justice Scalia. Could you give me some help in that? Sure. Justice Kennedy, the reality is, I think this Court's opinions have, at various times, applied both strains of the analysis. And which one — and what test do you suggest that we follow if we want to clarify our jurisprudence? I'm — I'm a big believer in objective tests, Justice Kennedy. I'd be perfectly happy with you to apply a more textually-based, objective approach. I think there are certain justices that are more inclined to take more of a peek at legislative history. And I think if you look at the legislative history of this, it would only fortify the conclusion that you would reach from a very objective, textual inquiry. But I'm happy to focus the Court on the objective, textual inquiry. I don't understand. That objective test is what? That is whether the statute can operate in the manner that Congress — that Congress intended. And, I mean, it — No statute can do that, because once we chop off a piece of it, by definition, it's not the statute Congress passed. So it has to be something more than that. Justice Sotomayor, every one of your cases, if you have a formulation for severability, if you interpret it woodenly, it becomes tautological. And Justice Blackmun addressed this in footnote 7 of the Brock opinion that we rely on, where he says, of course it's not just — you know, it doesn't operate exactly in the manner because it doesn't have all the pieces. But you still make an inquiry as to whether — I mean, when Congress links two provisions together and one really won't work without the other — So what's wrong with the presumption that our law says, which is, we presume that Congress would want to sever? Wouldn't that be the simplest, most objective test, going past what Justice Scalia says we have done, okay? Get rid of legislative intent altogether, which some of our colleagues in other contexts have promoted, and just say, unless Congress tells us directly it's not severable, we shouldn't sever. We should let them fix their problems. You still haven't asked or answered me why in a democracy structured like ours, where each branch does different things, why we should involve the Court in making the legislative judgment. Justice Sotomayor, let me try to answer the specific question and then answer the big-picture question. The specific question is — I mean, you could do that. You could adopt a new rule now that basically says, look, we sever — Well, we've got a new rule. We presume. We've got the presumption in some cases, but some would call that judicial action. I think in fairness, though, Justice Sotomayor, to get to the point you're wanting to get to, you'd have to ratchet up that presumption a couple of ticks on the scale. And what's wrong with that? One thing that's wrong with that, which is still at a smaller level, is that's inconsistent with virtually every statement in every one of your severability opinions, which all talk about congressional intent. Well, it's not inconsistent with our practice, right, Mr. Clement? I mean, you have to go back decades and decades and decades, and I'm not sure even then you could find a piece of legislation that we refused to sever for this reason. Well, I don't think that's right, Justice Kagan. I mean, I think there are more recent examples. A great example, I think, which sort of proves — and maybe as a segue to get to my broader point — is a case that involves a State statute, not a Federal statute, but I don't think anything turns on that, is Randall v. Sorrell, where this Court struck down various provisions of the Vermont campaign finance law, but there were other contribution provisions that were not touched by the theory that the Court used to strike down the contribution limits. But this Court at the end of the opinion said, you know, there's no way to think that the Vermont legislator would want one of these handful of provisions there on the contribution side, so we'll strike down the whole thing. And if I could make the broader point, I mean, I think the reason it makes sense in a democracy with separation of powers to in some cases sever the whole thing is because sometimes a half a loaf is worse. And a great example, if I dare say so, is Buckley. In Buckley, this Court looked at a statute that tried to, in a coherent way, strike down limits on contributions and closely related expenditures. This Court struck down the ban on expenditures, left the contribution ban in place, and for four decades, Congress has tried to fix what's unsuccessfully. Whereas it would have, I think, worked much better from a democratic and separation of powers standpoint if the Court would have said, look, expenditures are — you can't limit expenditures under the Constitution. The contribution provisions joined at the hip. Give Congress a chance to actually fix the problem, not just — JUSTICE BREYER. Mr. Kagan, can I ask you one question, which is a practical question? I take as a given your answer to Justice Kennedy. You're saying, let's look at it objectively and say would Congress have intended this, okay? This is the mandate and the community. This is Titles I and II, the mandate, the community of preexisting condition, okay? Here's the rest of it, you know, and when I look through the rest of it, I have all kinds of stuff in there. And I haven't read every word of that, I promise. I mean, as you pointed out, there's biosimilarity, there's breastfeeding, there's promoting nurses and doctors to serve areas, there's the CLASS Act, et cetera. What do you suggest we do? I mean, should we appoint a special master with an instruction? Should we go back to the district court? You haven't argued most of these. As I hear you now, you're pretty close to the SG. I mean, you'd like it all struck down, but if we're supposed to apply the objective test, I don't know if you differ very much. So what do you propose that we do, other than spend a year reading all this and have you argue all? Right. What I would propose is the following, Justice Breyer, is you follow the argument this far, and then you ask yourself whether what you have left is a hollowed-out shell or whether you have... I would say the Breastfeeding Act, the getting doctors to serve underserved areas, the biosimilar thing in drug regulation, the CLASS Act, those have nothing to do with the stuff that we've been talking about yesterday and the day before, okay? So if you tell me at that level, I'd say, sure, they have nothing to do with it. They could stand on their own. The Indian thing about helping the underserved Native Americans, all that stuff has nothing to do with it. Black lung disease, nothing to do with it, okay? So that's... You know what you have there? A total off-the-cuff impression. So that's why I'm asking you, what should I do? What you should do is let me say the following, which is follow me this far, which is the mandatory individual mandate is tied, as the government suggests, to guaranteed issue and community rating. But the individual mandate, guaranteed issue, and community rating together are the heart of this Act. They're what make the exchanges work. The exchanges, in turn, are critical to the tax credits because the amount of the tax credit is key to the amount of the policy price on the exchange. The exchanges are also key to the employer mandate because the employer mandate becomes imposed on an employer if one of the employees gets insurance on the exchanges. But it doesn't stop there. Look at the Medicare provision for DISH hospitals, okay? These are hospitals that serve a disproportionate share of the needy. This isn't in Title I. It's in the other part that you had in your other hand. But it doesn't work without the mandate, community rating, and guaranteed issue. Can I ask you this, Mr. Clement? What would your fallback position be if we don't accept the proposition that if the mandate is declared unconstitutional, the rest of the Act, every single provision has to fall? Other dispositions have been proposed. There's the Solicitor General's disposition, recommended disposition, strike down the guaranteed issue and community rating provisions. One amicus says strike down all of Title I. Another one says strike down all of Title I and Title II. What would you suggest? Well, I think what I would suggest, Justice Alito, I don't want to be unresponsive, is that you sort of follow the argument through and figure out what in the core of the Act falls. And then I guess my fallback would be if what's left is a hollowed-out shell, you could just leave that standing. If you want a sort of practical answer, I mean, I do think you could just, you know, you could use Justice Breyer's off the cuff as a starting point and basically say, you know, Title I and a handful of related provisions that are very closely related to that are really the heart of the Act. The bigger volume, on the other hand, I mean, you could strike one and leave the other, but at a certain point, I'm sorry, Mr. Chief Justice. Finish your certain point. At a certain point, I just think that, you know, the better answer might be to say, we've struck the heart of this Act. Let's just give Congress a clean slate. If it's so easy to have that other big volume get reenacted, they can do it in a couple of days. It won't be a big deal. If it's not, because it's very — well, but, I mean, you can laugh at me if you want, but the point is, I'd rather suspect that it won't be easy, because I'd rather suspect that if you actually dug into that, there'd be something that was quite controversial in there and couldn't be passed quickly, and that's your whole point. The reality of the passage — I mean, this was a piece of legislation which there was — had to be a concerted effort to gather enough votes so that it could be passed, and I suspect with a that Justice Breyer was talking about, that was the price of a vote. Put in the Indian health care provision and I will vote for the other 2,700 pages. Put in the black lung provision and I'll go along with it. That's why all — many of these provisions, I think, were put in, not because they were unobjectionable. So presumably what Congress would have done is they wouldn't have been able to put together — cobble together the votes to get it through. Well, maybe that's right, Mr. Chief Justice, and I don't want to spend all my time on fighting over the periphery, because I do think there are some provisions that I think you would make as an exercise of your own judgment, the judgment that once you've gotten rid of the core provisions of this Act, that you would then decide to let the periphery fall with it. But if you want to keep the periphery, that's fine. What I think is important, though, as to the core provisions of the Act, which aren't just the mandate, community rating, and guaranteed issue, but include the exchanges, the tax credit, Medicare and Medicaid, as to all of that, I think you do want to strike it all down to avoid a redux of Buckley, if I could reserve the remainder of my time. Thank you, Mr. Clement. Mr. Kneedler? Thank you, Mr. Chief Justice, and may it please the Court. There should be no occasion for the Court in this case to consider issues of severability, because, as we argue, the minimum coverage provision is fully consistent with Article I of the Constitution. But if the Court were to conclude otherwise, it should reject Petitioner's sweeping proposition that the entire Act must fall if this one provision is held unconstitutional. As an initial matter, we believe the Court should not even consider that question. The vast majority of the provisions of this Act do not even apply to the Petitioners, but instead apply to millions of citizens and businesses who are not before the Court. How does your proposal actually work? Your idea is that, well, they can take care of it themselves later. I mean, do you contemplate them bringing litigation and saying, I guess the insurers would be the most obvious ones. Without the mandate, the whole thing falls apart, and we're going to bear greater costs, and so the rest of the law should be struck down, and that's a whole other line of litigation? Well, I think the continuing validity of any particular provision would arise in litigation that would otherwise arise under that provision by parties who are actually — What cause of action is it? I've never heard of a severability cause of action. Well, in the first place, I don't — the point isn't that there has to be an affirmative cause of action to decide this. You could, for example, to use the Medicare reimbursement One of the things this Act does is change Medicare reimbursement rates. Well, the place where someone adjudicates the validity of Medicare reimbursement rates is through the special statutory review procedure for that. And the same thing is true of the Anti-Injunction Act. There are some provisions which nobody would have standing to challenge. If the provision is simply an expenditure of federal money, it doesn't hurt anybody except the taxpayer, but the taxpayer doesn't have standing. That just continues, even though it is so closely aligned to what's been struck down that it ought to go as well. But nonetheless, that has to continue because there's nobody in the world that can challenge it. Can that possibly be the law? I think that proves our point, Justice Scalia. This Court has repeatedly said that just because no one may have standing to challenge, and particularly like tax credits or taxes, which are challenged only after going through the Anti-Injunction Act, just because no one has standing doesn't mean someone must. But beyond that — But those are provisions that have been legitimately enacted. The whole issue here is whether these related provisions have been legitimately enacted or whether they are so closely aligned to one that has been held to be unconstitutional that they also have not been legitimately enacted. You can't compare that to cases dealing with a statute that nobody denies is constitutional. This case is directly parallel to the Prince case in our view. In that case, the Court struck down several provisions of the Brady Act but went on to say it had no business addressing the severability of other provisions that did not apply to the people before the court. But what he's thinking of is this. I think Justice Scalia is thinking, I suspect, of — imagine a tax which says this tax in amount Y goes to purpose X, which will pay for half of the money. Does the government just sit there collecting half the money forever because nobody can ever challenge it? You see, if it were inextricably connected, is it enough to say, well, we won't consider that because maybe somebody else could bring that case and then there is no one else? I think that is — Mr. Bentelega, it's not a choice between someone else bringing the case and the law staying in place. And what we're really talking about, as Justice Sotomayor started this discussion, is who is the proper party to take out what isn't infected by the Court's holding. With all these provisions where there may be no standings, one institution clearly does have standing, and that's Congress. And if Congress doesn't want the provisions that are not infected to stand, Congress can take care of it. It's a question of which side — should the Court say, okay, we're going to wreck the whole thing, or should the Court leave it to Congress? We think the Court should leave it to Congress for two reasons. One is the point I'm making now about justiciability or whether the Court can properly consider it at all. And the second is we think only a few provisions are inseparable from the minimum coverage provision. I just would like to — Before you go, Mr. Kneedler, I'd like your answer to Justice Breyer's question. I think you were interrupted before I had a chance. No. We believe that in that case, the tax provision should not be struck down. In the first place, the Anti-Injunction Act would bar a direct suit to challenge it. It would be very strange to allow a tax to be struck down on the basis of a severability analysis. Severability arises in a case only where it's necessary to consider what relief a party before the Court should get. The only part of the — Suppose there was a non-severability provision in this Act. If one provision were to be held unconstitutional, then every single — someone would have to bring a separate lawsuit challenging every single other provision in the Act and say, well, one fell, and the Congress said it's all a package. It can't be separated. That's your position? The fact that that's — such a clause might make it easy doesn't change the point. Article 3 jurisdictional problems apply to easy questions as well as hard questions. If I could just — But there's no Article 3 jurisdictional problem, and Justice — the leader's hypothetical that this is a remedial exercise of the Court's power to explain the consequences of its judgment in this case. But this Court has said that one has to have standing for every degree of relief that is sought. That was in Davis. That was Los Angeles v. Lyons. It's Pat Chandler Chrysler. Don't you think it's unrealistic to say, leave it to Congress, as though you're sending it back to Congress for Congress to consider it dispassionately, on balance, should we have this provision or should we not have provision? That's not what it's going to be. It's going to be, these provisions are in effect, even though a lot of you never wanted them to be in effect, and you only voted for them because you wanted to get the heart of the Act, which has now been cut out. But nonetheless, these provisions are the law, and you have to get the votes to overturn them. That's an enormously different question from whether you get the votes initially to put them into the law. There is no way that this Court's decision is not going to distort the Congressional process. Whether we strike it all down or leave some of it in place, the Congressional process will never be the same. One way or another, Congress is going to have to reconsider this, and why isn't it better to have them reconsider it, what should I say, in total, rather than having some things already in the law, which you have to eliminate before you can move on to consider everything on balance? We think as a matter of judicial restraint, limits on equitable remedial power, limit this Court to addressing the provision that has been challenged as unconstitutional and anything else that the relief. When you say judicial restraint, you are echoing the earlier premise that it increases the judicial power if the judiciary strikes down other provisions of the Act. I suggested to you it might be quite the opposite. We would be exercising the judicial power if one provision was stricken and the other remained to impose a risk on insurance companies that Congress had never intended. By reason of this Court, we would have a new regime that the Congress did not provide for, did not consider. That, it seems to me, can be argued at least to be a more extreme exercise of judicial power than striking the whole. I just don't accept the premise. I think not, Justice Kennedy, and then I'll move on. But this is exactly the situation in Prince. The Court identified the severability questions that were briefed before the Court as important ones, but said that they affect people who are — rights and obligations of people who were not before the Court. Mr. Kneedler, move away from the issue of whether it's a standing question or not. Make the assumption that this is an issue of the Court's exercise of discretion, because the last two questions had to do with what's wise for the Court to do, not whether it has power to do it or not. So let's move beyond the power issue, which your answers have centered on, and give me the sort of policy — and I know that's a what should guide the Court's discretion. Well, we think that matters of justiciability do blend into as — I understand — blend into discretion and, in turn, blend into the merits of the severability question. And as to that, just to answer a question that several justices have asked, we think that severability is a matter of statutory interpretation. It should be resolved by looking at the structure and the text of the Act, and the Court may look at legislative history to figure out what the text and structure mean with respect to severability. We don't — Mr. Kneedler, what happened to the Eighth Amendment? Do you really want us to go through these 2,700 pages? And do you really expect a Court to do that? Or do you expect us to give this function to our clerks? Is this not totally unrealistic that we're going to go through this enormous bill, item by item, and decide each one? Well — But you don't have to, because you have to look at what Congress said was essential, correct? That is correct. And I'd also like to — I just wanted to finish the thought I had about this being a matter of statutory interpretation. The Court's task, we submit, is not to look at the legislative process to see whether the bill would have been — would have passed or not based on the political situation at the time, which would basically convert the Court into a function such as a whip count. That's not the Court's — And, Mr. Kneedler, that would be a revolution in our severability law, wouldn't it? Yes, it would. I mean, we have never suggested that we're going to say, look, this legislation was a brokered compromise, and we're going to try to in the complex parliamentary shenanigans that go on across the street and figure out whether they would have made a difference. Instead, we look at the text that's actually given us. For some people, we look only at the text. It should be easy for Justice Scalia's clerks. I think that's — I don't care whether it's easy for my clerks. I care whether it's easy for me. I think that — I think that's exactly right. As I said, it is a question of statutory interpretation. Well, how is that — what's exactly right? It's a question of statutory interpretation. That means you have to go through every line of the statute. I haven't heard your answer to Justice Scalia's question yet. But I think in this case, there is an easy answer, and that is, Justice Kagan pointed out that the Act itself creates a sharp dividing line between the guaranteed issue and community rating. That is one package that Congress deemed essential. How do you know that? Where is this line? I looked through the whole Act. Where is the sharp line? It is in Congress's findings that the minimum coverage provision — without it, the courts, the Congress said, in finding I, without that provision, people would wait to get insurance and therefore — and cause all the adverse selection problems that they've raised. That makes your case that the one provision should fall if the other does. It doesn't tell us anything about all the other provisions. Well, I think — I think it does, because Congress said it was essential to those provisions, but it conspicuously did not say that it was essential to other provisions. May I ask you about the argument that's made in the economists' amicus brief? They say that the insurance reforms impose 10-year costs of roughly $700 billion on the insurance industry, and that these costs are supposed to be offset by about $350 billion in new revenue from the individual mandate and $350 billion from the Medicaid expansion. Now, if the $350 billion — maybe you'll disagree with the numbers, that they're fundamentally wrong, but assuming that they're in the ballpark, if the $350 million from the individual mandate were to be lost, what would happen to the insurance industry, which would now be in the hole for $350 billion over 10 years? I don't — I mean, first of all, for the Court to go beyond text and legislative history to try to figure out how the finances of the bill operate, it's like being the Budget Committee. But we think the economists have added up the figures wrong. If there's Medicaid expansion, and the insurance companies are involved in that, they're going to be reimbursed. But what if there isn't Medicaid expansion? We've talked about the individual mandate. Does the government have a position on what should happen if the Medicaid expansion is struck down? We don't — we don't think that that would have any effect. I mean, that could be addressed in the next argument, but we don't think that would have any effect on the rest of the — on the rest of the act. So the government's position is that if Medicaid expansion is struck down, the rest of the act can operate? Yes. Yes, it's — in the past, Congress has expanded Medicaid coverage without there being — it's done it many times — without there being a minimum coverage provision. But I still don't understand where you are with the answer to Justice Alito's question. Assume that there is a substantial probability that the $350 billion plus $350 billion equals seven is going to be cut in half if the individual mandate is struck. Assume there is a significant possibility of that. Is it within the proper that there be that kind of risk? Well, we don't think it's in the court's place to look at the budgetary implications, and we also — But isn't that — isn't that the point, then, why we should just assume that it is not severable? If we lack the competence to even assess whether there's a risk, then isn't this an awesome exercise of judicial power — No, I don't — — to say, we're doing something and we're not telling you what the consequences might be? No, I don't think so, because when you're talking about monetary consequences, you're looking through the act. You're looking behind the act. Rather, the court's function is to look at the text and structure of the act and what the substantive provisions of the act themselves mean. And if I could go past this — Can I — can you give us a prior case in — that resembles this one, in which we are asked to strike down what the other side says is the heart of the act, and yet leave in — as you request, leave in effect the rest of it? Have we ever — most of our severability cases, you know, involve one little aspect of the act, and the question is whether the rest. When have we ever really struck down what was the main purpose of the act and left the rest in effect? I think Booker is the best example of that. In Booker, the mandatory sentencing provisions were central to the act, but the court said Congress would have preferred a statute without the remained. I think the reason the majority said that was that they didn't think that what was essential to the act was what had been stricken down, and that is the ability of the judge to say on his own what the punishment would be. I don't think that's a case where we struck — where we excise the heart of the statute. Do you have another one? There's no example — There is no example. There's no example to our — that we have found that suggests the contrary. Well, it's really a case of first impression. I don't know. Another case where we have been confronted with this decision. Can you take out the heart of the act and leave everything else? Well, I'd like to go to the heart of the act point in a moment, but what I would like to say is this is a huge act with many provisions that are completely unrelated to market reforms and operate in different ways, and we think it would be extraordinary in this extraordinary act to strike all of that down because there are many provisions, and it would be too hard to — I mean, I think it's not uncommon that Congress passes an act, and then there are many different titles, and some of the titles have nothing to do with the other titles. That's a common thing, and you're saying you've never found an instance where they're all struck out when they have nothing to do with each other. My question is, because I hear Mr. Clement saying something not too different from what you say. He talks about things at the periphery. We can't reject or accept an argument on severability because it's a lot of work for us. That's beside the point, but do you think that it's possible for you and Mr. Clement — I'm exploring this — to get together and agree on what — I mean, on a list of things that are, in both your opinions, peripheral? Then you would focus on those areas where one of you thinks it's peripheral and one of you thinks it's not peripheral, and at that point, it might turn out to be far fewer than we're currently imagining, at which point we could hold an argument or figure out some way, or somebody hold an argument and try to get those done. Is that a pipe dream, or is that a — I just don't think that's realistic. The Court would be doing it without the parties, millions of parties — Have a conference committee report afterwards, maybe. Yes. No, it just is not something that a court would ordinarily do, but I would like — Back to the argument of the heart. Striking down the heart, do we want half a loaf or a shell? Right. I think those are the two analogies. Right, and I would like to discuss it again in terms of the text and structure of the Act. We have very important indications from the structure of this Act that the whole thing is not supposed to fall. The most basic one is the notion that Congress would have intended the whole Act to fall if there couldn't be a minimum coverage provision is refuted by the fact that there are many, many provisions of this Act already in effect without a minimum coverage provision. Two and a half million people under 26 have gotten insurance by one of the insurance requirements. $3.2 billion — Anticipation of the minimum coverage. That's going to bankrupt the insurance companies, if not the states, unless this minimum coverage provision comes into effect. There's no reason to think it's going to bankrupt anyone. The costs will be set to cover those amounts. I thought that the 26-year-olds were saying that they were healthy and didn't need insurance. Well, two and a half million people would be thrown off the insurance rolls if the Court were to say that. Congress made many changes to Medicare rates that have gone into effect for the courts to have to unwind millions of Medicare reimbursement rates. Medicare has covered 32 million preventive care visits by patients as a result of this Act. All of that was based on the assumption that the mandate was constitutional. And that certainly doesn't stop us from reaching our own determination on that. What I'm saying is that it's a question of legislative intent, and we have a very fundamental indication of legislative intent that Congress did not mean the whole Act to fall without the minimum coverage provision, because we have many provisions that are operating now without that. But there's a further indication about why the line should be drawn where I've suggested, which is the package of these particular provisions. All of the other provisions of the Act would continue to advance Congress's goal. It's the test that was articulated in Booker, but it's been said in Reagan and other cases. You look to whether the other provisions can continue to advance the purposes of the Act. Here they unquestionably can. The public health, the broad public health purposes of the Act that are unrelated to the minimum coverage provision, but also the other provisions designed to enhance access to affordable care. The employer responsibility provision, the credit for small businesses, which is already in effect, by the way, and affecting many small businesses. Many of the people in Congress might not have voted for those provisions if the central part of this statute was not adopted. To say that we're effectuating the intent of Congress is just we're really desired by Congress on their own and which ones weren't. The question for the court is Congress having passed the law, by whatever majority there might be in one house or the other, Congress having passed the law, what at that point is the legislative intent embodied in the law Congress has actually passed? Well, that's right. But the problem is, straight from the title, we have two complementary purposes, patient protection and affordable care. And you can't look at something and say, this promotes affordable care, therefore it's consistent with Congress's intent, because Congress had a balanced intent. You can't look at another provision and say this promotes patient protection without asking if it's affordable. So it seems to me if you ask what is going to promote Congress's purpose, that's just an inquiry that you can't carry out. No, with respect, I disagree because I think it's evident that Congress's purpose was to expand access to affordable care. It did it in discrete ways. It did it by the penalty on employers that don't offer suitable care. It did it by offering tax credits to small employers. It did it by offering tax credits to purchasers. All of those are a variety of ways that continue to further Congress's goal, and most of all Medicaid, which is unrelated to the private insurance market altogether. And in adopting those other provisions, governing employers and whatnot, Congress built on its prior experience of using the tax code, which it has, for a long period of time, Congress has subsidized. I don't quite understand about the employers. You're saying Congress mandated employers to buy something that Congress itself has not contemplated? I don't understand that. No, I mean, employer coverage, 150 million people in this country already get their insurance through their employers. What Congress did in seeking to augment that was to add a provision requiring employers to purchase insurance based on the assumption that the cost of those policies would be lowered by certain provisions, which are, by hypothesis, we're not sure, or in doubt. No, I think it's that any cost assumptions, there's no indication that Congress made any cost assumptions, but there's no reason to think that the individual market, which is where the minimum coverage provision is directed, would affect that. I would like to say, I pointed out why the other things would advance Congress's goal. The point here is that the package of three things would run contrary to Congress's goal if you took out the minimum coverage provision, and here's why. And this is reflected in the findings. If you take out minimum coverage but leave in the guaranteed issue and community rating, you will make matters worse. Rates will go up, and there will be fewer people covered in the individual market. Well, if that is true, what is the difference between the guaranteed issue and community rating provisions on the one hand, and other provisions that increase costs substantially for insurance companies? For example, the tax on high-cost health plans, which the economists' amicus brief said will cost $217 billion over 10 years. What Congress did not think of those things as insurance companies. Insurance companies are participants in the market for Medicaid and other things. But you're saying we have the expertise to make the inquiry you want us to make, i.e., the guaranteed issue, but not the expertise that Justice Alito's question suggests we must make. Well, that's because I think this Court's function is to look at the text and structure and legislative history of the law that Congress enacted, not a financial balance sheet which doesn't appear anywhere in the law. And you're relying on Congress's quite explicitly tying these three things together. We do. And it's not just the text of the Act, but the background of the Act, the experience in the States, the testimony of the National Association of Insurance Commissioners. That's the problem Congress was addressing. There was a shifting of present actuarial risks in that market that Congress wanted to correct. And if you took the minimum coverage provision out and left the other two provisions in, there would be laid on top of the existing shifting of present actuarial risks an additional one, because the uninsured would know that they would have guaranteed access to insurance. Whenever they became sick, it would make the adverse selection in that market problem even worse. And so what — and Congress trying to come up with a market-based solution to control rates in that market has adopted something that would work to control costs by guaranteed issue and community rating, but if you take out the minimum coverage, that won't work. That was Congress's assumption, again, shown by the text and legislative history of this provision. And that's why we think those things rise or fall in the package, because they cut against what Congress was trying to do. All of the other provisions would actually increase access to affordable care and would have advantageous effects on price. Again, Congress was invoking its traditional use of the tax code, which has long subsidized insurance through employers, has used that to impose a tax penalty on employers to give tax credits. This is traditional stuff that Congress has done. And the other thing Congress has done, those preexisting laws had their own protections for guaranteed issue and community rating effectively within the large employer plans. They can't discriminate among people. They can't charge different rates. What Congress was doing was doing that in the other market. But if it can't, that's all that should be struck from the act. Thank you, Mr. Kneedler. Mr. Farr? Mr. Chief Justice, and may it please the Court, at the outset, I would just like to say I think that the government's position in this case, that the community rating and guaranteed issue provisions ought to be struck down, is an example of the best driving out the good. Because even without the minimum coverage provision, those two provisions, guaranteed issue and community rating, will still open insurance markets to millions of people that were excluded under the prior system and for millions of people will lower prices, which were raised high under the old system, because of their poor health. So even though the system is not going to work precisely as Congress wanted, it would certainly serve central goals that Congress had of expanding coverage for people who were unable to get coverage or unable to get it at affordable prices. And one of the points that Mr. Kneedler made is that the price won't be affordable, because he spoke of the adverse selection problem, that there will be so fewer people in there, the insurance companies are going to have to raise the premiums. So it's nice that Congress made it possible for more people to be covered, but the reality is they won't, because they won't be able to afford the premium. Well, Justice Ginsburg, let me say two things about that. First of all, when we talk about premiums becoming less affordable, it's very important to keep in mind different groups of people, because it is not something that applies accurately to everybody. For people who were not able to get insurance before, obviously their insurance beforehand was, their price was essentially infinite. They were not able to get it at any price. They will now be able to get it at a price that they can afford. For people who are unhealthy and were able to get insurance, but perhaps not for the things that they were most concerned about, or only at very high rates, their rates will be lower under the system, even without the minimum coverage provision. Also, you have a large number of people who under the Act— Excuse me, why do you say I didn't follow that? Why? Because— Why would their rates be lower? Their rates are going to be lower than they were under the prior system, because they're going into a pool of people, some of whom are healthy, rather than having their rates set according to their individual health characteristics. That's why their rates are so high. But the problem, Mr. Carr, isn't it that they're going to a pool of people that will gradually get older and unhealthier. That's the way the thing works. Once you say that the insurance companies have to cover all the sick people and all the old people, the rates climb, more and more young people and healthy people say, why should we participate? We can just get it later when we get sick. So they leave the market, the rates go up further, more people leave the market, and the whole system crashes and burns, becomes unsustainable. This is not what I think. What do I know? It's just what's reflected in Congress's findings, that it looks at some states and says, this system crashed and burned. It looked at another state with the minimum coverage provision and said, this one seems to work. So we'll package the minimum coverage provision with the nondiscrimination provisions. JUSTICE BREYER. Well, in a moment I'd like to talk about the finding, but if I could just postpone that for a second and talk about adverse selection itself. I think one of the misconceptions here, Justice Kagan, is that Congress, having seen the experience of the states in the 90s with community rating and guaranteed issue, simply imposed the minimum coverage provision as a possible way of dealing with that, and if you don't have the minimum coverage provision, then essentially adverse selection runs rampant. But that's not what happened. Congress included at least half a dozen other provisions to deal with adverse selection caused by bringing in people who were less healthy into the Act. There are, to begin with, the Act authorizes annual enrollment periods, so people can't just show up at the hospital. If they don't show up and sign up at the right time, they at least have to wait to the time next year. That's authorized by the Act. With respect to the subsidies, there are three different things that make this important. First of all, the subsidies are very generous. For people below 200 percent of the federal poverty line, the subsidy will cover 80 percent on average of the premium, which makes it attractive to them to join. The structure of the subsidies, because their income, they create a floor based on the income of the person getting the insurance, and then the government covers everything over that. And this is important in adverse selection, because if you do have a change in the mix of people and average premiums start to rise, the government picks up the increase in the premium. The amount that the person who's getting insured contributes remains constant at a percentage of his or her income. And the third thing is- There's nothing about federal support that is unsustainable, right? That is infinite. Well, I mean, that's a fair point, Justice Scalia, although one of the things that happens if you take the mandate out, while it is true that the subsidies that the government provides to any individual will increase and they will be less efficient, I'm not disputing that point. Actually, the overall amount of the subsidies that the government will provide will decline, as the government notes itself in its brief, because there will be fewer people getting them. Some people will opt out of the system even though they're getting subsidies. But I'd just like to go back for one more second to the point about how the subsidies are part of what Congress was using, because the other thing is that for people below 250 percent of the federal poverty line, Congress also picks up and subsidizes the out-of-pocket costs, raising the actuarial value. And so you have all of that. And then you have Congress also, unlike the states, establishing-or I should be precisely accurate, unlike almost all the states-establishing an age differential of up to three to one. So an insurance company, for example, that is selling a 25-year-old a policy for $4,000 can charge a 60-year-old $12,000 for exactly the same coverage. The states, typically in the 90s, when they were instituting these programs, they either had pure community rating, where everybody is charged the same premium-everybody, regardless of their age, is charged the same premium. Some states had a variance of 1.5 to 1. Massachusetts, for example, which did have good subsidies, but their age band was two to one. So when Congress is enacting this act, it's not simply looking at the states and thinking, well, that didn't go very well. Why don't we put in a minimum coverage provision? That'll solve the problem. Congress did a lot of different things to try to combat the adverse selection. Now, if I could turn to the finding, because I think this is the crux of the government's position, and then the plaintiffs pick up on that and then move from that to the rest of the act. And it seems to me, quite honestly, it's an important part, because that is textual. You know, in this whole sort of quest for what we're trying to figure out, the finding seems to stand out as something that the Court can rely on and say, here's something Congress has actually told us. But I think the real problem with the finding is that the context in which Congress made it. It's quite clear that if the Court wants to look, the findings on page 42, 43a, excuse me, of the Solicitor General's severability brief in the appendix. But the finding is made specifically in the context of interstate commerce. That is why the findings are in the act at all. Congress wanted to indicate to the Court, knowing that the minimum coverage provision was going to be challenged, wanted to indicate to the Court the basis on which it believed it had the power under the Commerce Clause to enact this law. Why does that make a difference with respect to finding I, which is the one that the government is relying on, and in particular, the last sentence, which says this requirement is essential to creating effective health insurance markets in which guaranteed issue and pre-existing illnesses can be covered? The reason is because the word essential in the Commerce Clause context doesn't have the colloquial meaning. In the Commerce Clause context, essential effectively means useful. So that when one says in Lopez, when the Court says section 922Q is not an essential part of the larger regulatory scheme of economic activity, it goes on to say in which the regulatory scheme would be undercut if we didn't have this provision. Well, if that's all Congress means, I agree with that. The system will be undercut somewhat if you don't have the minimum coverage provision. It's like the word necessary in the Necessary Proper Clause. It doesn't mean, as the Court has said on numerous occasions, absolutely necessary. It means conducive to useful, advancing the objectives, advancing the aims. And it's easy to see, I think, that that's what Congress— I'm sorry, Justice Scalia? —that definition of essential, it's very imaginative. Just give me one dictionary. Well, but I think my point, Justice Scalia, is that they're not using it in the true dictionary sense. How do we know that? When people speak, I assume they're speaking English. I think that there are several reasons that I would suggest that we would know that from. The first is, as I say, that the findings themselves, Congress says at the very beginning, the head of it is Congress makes the following findings. And they're talking about the interstate, you know, B is headed, effects on the national economy and interstate commerce. So we know the context that Congress is talking about. It is more or less quoting from the Court's Congress Clause statement. But if one looks at the very preceding finding, which is finding H, which is on 42 over on the 43, Congress at that point also uses the word essential in the second sentence. It says this requirement—and again, we're talking about the minimum coverage provision—is an essential part of this larger regulation of economic activity, which is, by the way, an exact quote from Lopez, in which the absolute requirement undercut federal relation, also exact quote from Lopez. But what it's referring to is an essential part of ERISA, the National Health Service Act, and the Affordable Care Act. It can't possibly be, even the plaintiffs have an argument, that those acts would all fall in their entirety if you took out the minimum coverage provision. And as a second example of the same usage by Congress, the statute that was before the Court in Raich, Section 801 of Title 21, the Court said that the regulation of intrastate drug activity, drug traffic, was essential to the regulation of interstate drug activity. Again, it is simply not conceivable that Congress was saying one is so indispensable to the other, the way the United States uses the term here, so indispensable that if we can't regulate the intrastate traffic, we don't want to regulate the interstate traffic either. The whole law criminalizing drug traffic would fall. So I think once you look at the finding for what I believe it says, which is we believe this is a useful part of our regulatory scheme, which Congress would think in its own approach would be sufficient. Counsel, the problem I have is that you're ignoring the congressional findings and all the evidence Congress had before it, that community ratings and guarantee issuance would be a death spiral, I think that was the word that was used, without minimum coverage. Those are all of the materials that are part of the legislative record here. So even if it might not be because of the structure of the Act, that's post hoc evidence. Why should we be looking at that as opposed to what Congress had before it, and use essential in its plain meaning? You can't have minimum coverage without what the SG is arguing, community ratings and guaranteed issuer, you can't have those two without minimum coverage. I think that's a fair question, but the idea that all the information before Congress only led to the idea that you would have death spirals seems to me to be contradicted a little bit at least by the CBO report in November of 2009, which is about four months before the Act passed, where the CBO talks about adverse selection. Now I want to be clear, this is at a time when the minimum coverage provision was in the statute, so I'm not suggesting that this is a discussion without that in it. But nonetheless, the CBO goes through and talks about adverse selection, and points out the different provisions in the Act, the ones I've mentioned, plus one other actually, where in the first three years of the operation of the exchanges, those insurance companies that get sort of a worse selection of consumers will be given essentially credit from insurance companies that get better selection. Do you want us to write an opinion saying we have concluded that there is an insignificant risk of a substantial adverse effect on the insurance company? That's our economic conclusion, and therefore not several. That's what you want me to say? It doesn't sound right, the way you say it, Justice Kennedy. No, I— But you don't want them to say either that there's a death spiral. You don't want us to make either of those two findings, do you? That's correct. No, I agree that there's a risk, and the significance of it people can debate. But what I think is lost in that question, and I didn't mean to be whimsical about it, I think what is lost in it a little bit is what's on the other side, which is the fact that if you follow the government's suggestion, if the court follows the government's suggestion, what is going to be lost is something we know is a central part of the Act. I mean, indeed, if one sort of looks at the legislative history more broadly, I think much of it is directed toward the idea that guaranteed issue and community rating were crown jewel of the Act. The minimum coverage provision wasn't something that everybody was bragging about. It was something that was meant to be part of this package. I agree with that. But the point of it was to have guaranteed issue and minimum coverage—I mean, excuse me, guaranteed issue and community rating. And that's under the government's proposal. Those would disappear. We would go back to the old system, and under what I think is the proper severability analysis, the real question the court is asking, should be asking, is would Congress rather go back to the old system than to take, perhaps, the risks that you're talking about, Justice Kennedy? You're referring to the government's second position. Their first, of course, is that we shouldn't address this issue at all. That's correct. I asked Mr. Kneedler about what procedure or process would be anticipated for people who are affected by the change in the law and the change in the economic consequences. Do you have a view on how that could be played out? It does seem to me that if we accept your position, there has to be a broad range of consequences, whether it's additional legislation, additional litigation. Any thoughts on how that's going to play out? Well, if the court adopts the position that I'm advocating, Mr. Chief Justice, I think what would happen is that the court would say that the minimum coverage provision, by hypothesis, of course, is unconstitutional, and the fact of that being unconstitutional does not mean the invalidation of any other provision. So under the position I'm advocating, there would no longer be challenges to the remaining part of the Act. But if the challenge is what we're questioning today, whether if you're an insurance company and you don't believe that you can give the coverage in the way Congress mandated it without the individual mandate, what type of action do you bring in court? If the court follows the course that I'm advocating, you do not bring an action in court. You go to Congress and you seek a change from Congress to say the minimum coverage provision has been struck down by the court. Here is the information that we have to show you what the risks are going to be. Here are the adjustments you need to make. One of the questions earlier pointed out that states have adjusted their systems as they've gone along, as they've seen things work or not work. I was talking earlier about the different ratio for ages in insurance. The states have tended to change that because they've found that having too narrow a band worked against the effectiveness of their programs. Except for Massachusetts, they didn't enact mandates. I think to answer your question directly, Mr. Chief Justice, the position I'm advocating would simply have those pleas go to Congress, not in court. If one, just to discuss the issue more generally, if that's helpful, I think that if there were situations where the court deferred, let's say for discretionary reasons, the court said we're not going to take up the question of severability and therefore not resolve it in other situations, it certainly seems to me that in enforcement actions, for example, if the time comes in 2014 and somebody applies to an insurance company for a policy and the insurance company says, well, we're not going to issue a policy, we don't think your risks are ones that we're willing to cover, it seems to me that they could sue the insurance company and the insurance company could raise as a defense that this provision, the guarantee issue provision of the statute, is not enforceable because it was inseverable from the decision, from the provision that the court held unconstitutional in 2012. Let's consider how your approach severing as little as possible thereby increases the deference that we're showing to Congress. It seems to me it puts Congress in this position. This act is still in full effect. There is going to be this deficit that used to be made up by the mandatory coverage provision. All of that money has to come from somewhere. You can't repeal the rest of the act because you're not going to get 60 votes in the Senate to repeal the rest. It's not a matter of enacting a new act. You've got to get 60 votes to repeal it. So the rest of the act is going to be the law. So you're just put to the choice of, I guess, bankrupting insurance companies and the whole system comes tumbling down or else enacting a federal subsidy program to the insurance companies, which is what the insurance companies would like, I'm sure. Do you really think that that is somehow showing deference to Congress and respecting the democratic process? It seems to me it's a gross distortion of it. Well, Your Honor, the difficulty is that it seems to me the other possibility is for the court to make choices particularly based on what it expects the difficulties of Congress altering the legislation after a court ruling would be. I'm not aware of any severability decision that has ever been made. No, that wouldn't be my approach. My approach would say if you take the heart out of the statute, the statute's gone. That enables Congress to do what it wants in the usual fashion and it doesn't inject us into the process of saying this is good, this is bad, this is good, this is bad. To me, it reduces our options the most and increases Congress's the most. I guess to some extent I have to quarrel with the premise, Justice Scalia, because at least the position that I'm advocating today under which the court would only take out the minimum coverage provision I don't think would fit the description that you have given of taking out the heart of the statute. Now, I do think once you take out guaranteed issue and community rating, you are getting closer to the heart of the statute. And one of the difficulties, I think, with the government's position is that I think it's harder to cabin that, to draw that bright line around it. It's harder than the government thinks it is. I mean, to begin with, even the government seems to acknowledge, I think, that the exchanges are going to be relatively pale relatives of the exchanges as they're intended to be. We are going to have standardized products. Everybody can come and make comparisons based on products that look more or less the same. But the other thing that's going to happen is with the subsidy program. The way that the subsidy program is set up, the subsidy is calculated according to essentially a benchmark plan. If the court wants to look at the provisions, they begin at page 64A of the private plaintiff's brief, again, in the appendix. The particular provision I'm talking about is at 68A. But there's a question. You're looking essentially to calculate the premium by looking at a standardized silver plan. The first question, obviously, is, is there going to be any such plan if you don't have a guaranteed issue and community rating, if the plans can basically be individualized? But the second problem is that in the provision on 68A, the provision that's used for calculating the subsidy, what is anticipated in the provision under the act as it is now is that you do have the floor of the income, you would take this benchmark plan, and the government would pay the difference. And as we talked about earlier, the benchmark plan can change for age. And the provision says it can be adjusted only for age. So if, in fact, you even have such a thing as a benchmark plan anymore, if the rates of people in poor health go up because of individual insurance underwriting, the government subsidy is not going to pay for that. Mr. Farr, I understood that the answer that you gave to Justice Scalia was essentially that the minimum coverage provision was not the heart of the act. Instead, the minimum coverage provision was a tool to make the nondiscrimination provisions, community rating, guaranteed issue, work. So if you assume that, that all the minimum coverage is, is a tool to make those provisions work, then I guess I would refocus Justice Scalia's question and say, if we know that something is just a tool to make other provisions work, shouldn't that be the case in which those other provisions are severed along with the tool? No, I don't think so. Because there are many other tools to make the same things work. That's, I think, the point. The case that comes to mind is New York versus the United States, where the court struck down the take title provision, but left two other incentives essentially in place. Even without the minimum coverage provision, there will be a lot of other incentives still to bring younger people into the market and to keep them in the market. And if my reading of the finding is correct, and that's all that Congress is saying, that this would be useful, it doesn't mean that it's impossible to have a type of system Would you, I'd just like to hear before you leave your argument, if you want to, against what Justice Scalia just said. Let's assume, contrary to what you want, that the government's position is accepted by the majority of this Court. And so we now are rid, quote, of the two heart of the bill. Now still, there are a lot of other provisions here, like the Indian Act, the Black Lung Disease, the wellness program, the restaurants have to have a calorie count of major menus, etc. Now, some of them cost money, and some of them don't. And there are loads of them. What is your argument that just because the heart of the bill is gone, that has nothing to do with the validity of these other provisions, both those that cost money, or at least those that cost no money? You want to make an argument in that respect, that destroying the heart of the bill does not blow up the entire bill. It blows up the heart of the bill. And I'd just like to hear what you have to say about that. Well, Justice Breyer, I think what I would say is, if one goes back to what I think is the proper severability standard and say, would Congress rather have no bill as opposed to the bill with whatever is severed from it? It seems to me, when you're talking about provisions that don't have anything to do with the minimum coverage provision, there's no reason to answer that question as any other way than, yes, Congress would want these provisions. Is that the real Congress or a hypothetical Congress? An objective Congress. You're asking. Have you come across it? I'm not so specific. It's not with a vote count. Why put Congress to that false choice? You only have two choices, Congress. You have the whole bill or you can have parts of the bill or no bill at all. Why that false choice? I think the reason is because severability is by necessity a blunt tool. The court doesn't have, even if it had the inclination, doesn't essentially have the authority to retool the statute. I would say stay out of politics. That's for Congress, not us. But the question here is, you've read all these cases or dozens, have you ever found a severability case where the court ever said, well, the heart of the thing is gone and therefore we strike down these other provisions that have nothing to do with it, which could stand on their feet independently and can be funded separately or don't require money at all? I think the accurate answer would be, I'm not aware of a modern case that says that. I think there probably are cases in the 20s and 30s that would be more like that. If I could just take one second to address the economist brief, because Justice Alito raised it earlier. I just want to make one simple point, leaving aside the whole balancing thing, if one looks at the economist brief, I think it's very important to note that when they're talking about one side of the balance, may I finish, please? Certainly. When they're talking about the balance, they're not just talking about the minimum coverage provision. They very carefully worded to say the minimum coverage provision and the subsidy programs. And then, so when you're doing the mathematical balancing, the subsidy programs are extremely large. In year 2020, they're expected to be over $100 billion in that one year alone. So if you're looking at the numbers, please consider that. Thank you. Thank you, Mr. Farr. Mr. Clement, you have four minutes remaining. Let me make Guy's point. He says that Congress didn't go into this Act to impose minimum coverage. They went into the Act to have a different purpose, i.e., to get people coverage when they needed it, to increase coverage for people, that this is only a tool. But other states, going back to my original point, that there are other tools besides minimum coverage that Congress can achieve the same goals. So if we strike just a tool, why should we strike the whole Act when Congress has other tools available? Okay. Mr. Chief Justice, I'll make four points in rebuttal, but I'll start with Justice Sotomayor's question, which is to simply say, this isn't just a tool. It's the principal tool. Congress identified it as an essential tool. It's not just a tool to make it work. It's a tool to pay for it, to make it affordable. And again, that's not my characterization. That's Congress's characterization in finding I on page 43A of the government's brief. Now that brings me to my first point in rebuttal, which is Mr. Kneedler says quite correctly, tells this Court, don't look at the budgetary implications. Well, the problem with that, though, is once it's common ground, that the individual mandate is in the statute, at least in part, to make community rating and guaranteed issue affordable. That really is all you have to identify. That establishes the essential link, that it's there to pay for it. You don't have to figure out exactly how much that is and which box it — I mean, it clearly is a substantial part of it, because what they were trying to do is take healthy individuals and put them into the risk pool. And this is quoting their finding, which is in order — they put people into the market which will lower premiums. So that's what their intent was. So you don't have to get to the final number. You know that's what was going on here, and that's reason alone to sever it. Now, the government, Mr. Kneedler also says, there's an easy dividing line between what they want to keep and what they want to dish out. The problem with that is that, you know, you read their brief and you might think, oh, there's a guaranteed issue and a community rating provision subtitle in the bill. There's not. To figure out what they're talking about, you have to go to page 6 of their brief, of their opening severability brief, where they tell you what's in and what's out. And the easy dividing line, they suggest, is actually between 300G A1 and 300G A2, because on community rating, they don't — they say that A1 goes, but then they say A2 has to stay, because that's a way that you'll have some sort of kind of Potemkin community rating for the exchanges. But if you actually look at those provisions, A2 makes all these references to A1. It just doesn't work. Now, in getting back to an inquiry that I think this Court actually can approach, is to look at what Congress was trying to do, you need look no further than the title of the statute, patient protection and affordable care. I agree with Mr. Farr that community rating and guaranteed issue were the crown jewels of this Act. They were what was trying to provide patient protection. And what made it affordable? The individual mandate. So if you strike down guaranteed issue, community rating, and the individual mandate, there's nothing left to the heart of the Act. And that takes me to my last point, which is simply, this Court in Buckley created a halfway house, and it took Congress 40 years to try to deal with a situation when contrary to any time of their intent, they had to try to figure out, what are we going to do when we're stuck with this ban on contributions, but we can't get at expenditures because the Court told us we couldn't? And for 40 years, they worked in that halfway house. Why make them do that in health care? The choice is to give Congress the task of fixing the statute, the residuum of the statute after some of it struck down, or giving them the task of simply fixing the problem on a clean slate. I don't think that's a close choice. If the individual mandate is unconstitutional, the rest of the Act should fall. Thank you, Mr. Clement. Mr. Farr, you were invited by this Court to brief and argue in these cases in support of the decision below on severability. You have ably carried out that responsibility, for which we are grateful. Case number 11-393 is submitted. We will continue argument in case number 11-400 this afternoon.